United States District Court
Eastern District of New York

------------------------------------X

United States of America,

- against -

Emmanuel Clase de la Cruz, et al.

Defendants.

------------------------------------X

**Memorandum and Order**

No. 25-cr-346 (KAM)

**Kiyo A. Matsumoto, United States District Judge:**

Pending before the Court are the parties' motions in limine. Defendant Luis Leandro Ortiz Ribera ("Mr. Ortiz"), joined by Defendant Emmanuel Clase de la Cruz ("Mr. Clase") moves "(1) to exclude the testimony of the government's forensic examiner witnesses; (2) to compel complete expert disclosures for Special Agent Richard V.C. Busick and Professor Daniel Taylor; and (3) to preclude the government from characterizing Mr. Ortiz as 'in debt'" in connection with Mr. Ortiz's agreement with RockFence Capital Markets LLC. (ECF No. 214-1, ("Ortiz Mot.") at 1; (ECF No. 215, ("Clase Mot.") at 1).[1] The Government filed a response in opposition, (ECF No. 226 ("Gov. Opp.")), and Messrs. Clase and Ortiz filed replies in further support of their motions in limine, (ECF Nos. 238 ("Clase Reply"); 242 ("Ortiz Reply")). The Court

[1] In Mr. Clase's reply, Mr. Clase moved for a rebuttal expert deadline no later than four weeks before trial. On September 17, 2026, the Court ordered the Government to disclose rebuttal expert opinions as soon as possible, but in any event, no later than two weeks before trial.

will address the Government's motions in limine in a forthcoming Memorandum & Order.

The Court assumes familiarity with the facts and procedural background of this case, as set forth in this Court's memoranda and orders. (*See* ECF Nos. 75, 219, 277.) For the reasons set forth below, the Court respectfully **DENIES** Defendants' motions in limine without prejudice.

**Legal Standard**

A motion in limine is a request for the court to resolve a forecasted evidentiary dispute before trial. *United States v. James*, 607 F. Supp. 3d 246, 251 (E.D.N.Y. 2022). Although clear benefits result from the Court's resolution of potential evidentiary disputes before trial, the Court may exclude disputed evidence only if the evidence is clearly inadmissible on all potential grounds. *Id.* If the Court needs additional factual context to resolve the motion, the Court may reserve its decision until an appropriate time during trial. *Id.* at 252. Moreover, a district court's "ruling regarding a motion in limine is 'subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the movant's proffer.'" *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006) (alteration adopted) (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)).

Generally, evidence is admissible if it is relevant, Fed. R.

Evid. 402, and evidence is relevant if it has any tendency to make a consequential fact more or less probable than it otherwise would be. Fed. R. Evid. 401. Conversely, irrelevant evidence is generally not admissible. Fed. R. Evid. 402. The Court may exclude relevant evidence if its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

## Discussion

### I. Motions to Preclude the Government from Authenticating Cell Phone Extractions Using Record Certifications and to Exclude Testimony of the Government's Forensic Examiner Witnesses

Pursuant to this Court's pre-trial order, the parties' deadline for serving expert disclosures was August 24, 2026. In the Government's expert disclosures for two expert witnesses -- Special Agent Richard V.C. Busick and Professor Daniel Taylor -- the Government noted its intention to "call at trial one or more witnesses" – in addition to Special Agent Busick and Professor Taylor -- who were "involved in extraction and formatting of data from mobile phones as well as a Google account." (Ortiz Mot. at 2 (quoting ECF No. 200 at 1.)) These unnamed and undesignated "digital forensic examiners from the Federal Bureau of Investigation's Computer Analysis and Response Team ("CART")" would "authenticate the forensic extractions of the cellular telephones and of the Google account," and "will testify" both

"regarding how data is extracted or formatted from the source" and as to their "observations about the data that was extracted or placed in a format that is readable to a person." (Gov. Opp. at 1; Ortiz Mot. at 3.)

Mr. Ortiz moves to exclude forensic testimony by CART witnesses because such testimony would "cross the line into expert testimony within the ambit of Fed. R. Evid. 702." (Ortiz Mot. at 8.) The Government responds that it gave notice to Defendants about its forensic examiner witnesses out of an "abundance of caution" given that it is "well established" that forensic extractions of digital devices and cloud-based accounts may be authenticated through record certifications. (Gov. Opp. at 2.) Mr. Ortiz objects to the record certification method of authentication as violative of his Confrontation Clause rights. (Ortiz Reply at 3-4.)[2] The Court interprets Mr. Ortiz's objection as a separate motion to preclude the Government from authenticating cell phone extractions using record certifications and considers both motions in turn.

### A. Whether Cell Phone Extractions Can Be Authenticated Through Record Certifications

In general, all evidence other than live testimony must be authenticated. *See* Fed. R. Evid. 901(a). Prior to the admission of any evidence, the Court must make a preliminary determination

[2] Mr. Clase did not address this argument, which was raised in the Government's opposition, in his reply. (*See generally* Clase Reply.)

prior to the introduction of evidence regarding whether the proponent has introduced sufficient proof such that a reasonable juror could find that the evidence is what the proponent claims it to be. *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014); *United States v. Tin Yat Chin*, 371 F.3d 31, 37-38 (2d Cir. 2004). Certain items are "self-authenticating," meaning they require no extrinsic evidence of authenticity to be admitted. *See* Fed. R. Civ. P. 902 (listing self-authenticating items); *United States v. Gogic*, 2025 WL 3042350, at *5 (E.D.N.Y. Oct. 31, 2025). Self-authenticating evidence includes certified records generated by an electronic process or system, Fed. R. Evid. 902(13), and certified data copied from an electronic device, storage medium, or file, Fed. R. Evid. 902(14). Should the proponent seek to introduce evidence under either Federal Rule of Evidence 902(13) or (14), the evidence must be accompanied by a record certification signed under penalty of perjury by a qualified person, Fed. R. Evid. 902(12), and the proponent must also give the adverse party "reasonable written notice of the intent to offer the record -- and must make the record and certification available for inspection -- so that the [adverse] party has a fair opportunity to challenge them." Fed. R. Evid. 902(11).

Mr. Ortiz argues that the Government must authenticate cell phone extractions using live, expert testimony, presumably under Federal Rule of Evidence 901, which governs evidence that is not

self-authenticating. Federal Rule of Evidence 901 sets forth a non-exhaustive list of methods to establish authenticity, including (i) testimony of a witness with knowledge, (ii) identification of distinctive characteristics of the item to be authenticated, and (iii) producing evidence describing the process or system that generated the evidence and showing that those systems produce accurate results. Fed. R. Evid. 901 (b)(1), (4), (9). "Rule 901 'does not definitively establish the nature or quantum of proof that is required,'" *Gogic*, 2025 WL 3042350, at *5 (quoting *Vayner*, 769 F.3d at 133), nor "does [Rule 901] erect a particularly high hurdle," *United States v. Gonzalez*, 144 F.4th 396, 406 (2d Cir. 2025) (citation modified). Instead, evidence can be authenticated by evidence, including circumstantial evidence, so long as that evidence is "sufficient to support a finding that the item is what the proponent claims it is." *Gonzalez*, 144 F.4th at 406 (quoting Fed. R. Evid. 901(a)).

If the Court concludes that evidence has been authenticated, "the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight, not the admissibility, of the evidence." *Id.* The "ultimate determination as to whether the evidence is, in fact, what its proponent claims is . . . a matter for the jury." *Vayner*, 769 F.3d at 130.

The Court concludes that the forensic extractions may be authenticated by record certification, provided that the notice and certification requirements of Federal Rule of Evidence 902(13) and (14) are met. Such practice is commonplace in this Circuit. *See United States v. Merchant*, 2026 WL 457435, at *1-2 (E.D.N.Y. Feb. 18, 2026) (government may authenticate forensic extractions pursuant to Rule 902(13) and (14)) where "government personnel with firsthand knowledge have declared that the extractions constitute 'true' copies of the data on the corresponding devices, and described the automated process by which they confirmed that accuracy"); *United States v. Carter*, 2024 WL 268248, at *3 (S.D.N.Y. Jan. 24, 2024) (finding that decrypted iCloud data was self-authenticating under Rule 902(14) and that authentication by certification did not implicate defendant's confrontation rights); *United States v. Palmer*, 2025 WL 2978633, at *10 (S.D.N.Y. Oct. 21, 2025) (admitting certain email and phone records as self-authenticating); *United States v. Forney*, 2025 WL 2208298, at *18 (E.D.N.Y. Aug. 4, 2025); *United States v. Otufale*, 740 F. Supp. 3d. 233, 249-50 at *9-10 (E.D.N.Y. July 12, 2024).

Contrary to Mr. Ortiz's argument, the admission of the cell extractions under Federal Rule of Evidence 902 and without testimony would not violate his rights under the Confrontation Clause. It is well established that the admission of a record certification absent live testimony for purposes of establishing

authenticity will not offend the Sixth Amendment's Confrontation Clause, because such certification is not "testimonial." *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322-23 (2009) ("A clerk could by affidavit *authenticate* or provide a copy of an otherwise admissible record" without implicating the Confrontation Clause). Mr. Ortiz argues that the record certifications are akin to the affidavits in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), which the Supreme Court found implicated the defendant's Confrontation Clause rights. But the affidavits in *Melendez-Diaz* are easily distinguishable from the record certifications that would be used by the Government here. The *Melendez-Diaz* affidavits had shown the "results of the forensic analysis performed on the seized substances," "reported the weight of the seized bags[,] and identified the seized substance as cocaine." *Id.* at 308. By contrast, the record certifications here would be limited to authenticating the cell phone extractions as cell phone extractions.[3]

Accordingly, Mr. Ortiz's motion to preclude the Government from authenticating cell phone extractions using record certifications pursuant to Federal Rule of Evidence 902(13) and

---

[3] The admission of the extraction *itself* similarly would not implicate the Confrontation Clause, for cell phone extractions that "contain[] 'only machine-generated results,'" without "attestations or certifications" or "the statements of anyone," are not "testimonial." *Gonzalez*, 144 F.4th at 407 (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 673 (2011) (Sotomayor, J., concurring in part)).

(14) is respectfully **DENIED.** The Government may also authenticate the cell phone extractions pursuant to Federal Rule of Evidence 901, which requires the Government to produce "sufficient proof" such that "a reasonable juror could find in favor of authenticity or identification" at trial. *Gonzalez*, 144 F.4th at 406.

### B. Whether Forensic Examiner Testimony Constitutes Lay Testimony

The Government next argues that, in the event it calls a forensic examiner to offer forensic extractions from cell phones into evidence, such testimony would constitute lay and not expert testimony. (Gov. Opp. at 3.) The Court agrees that the Government need not provide expert disclosures if the testimony is limited to how the extractions were obtained or how devices were searched, and what was found on the devices based on the examiners' personal experience rather than based on specialized knowledge. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (summary order) (finding no error in allowing lay, non-expert testimony relating to search of electronic device where witness "explained his training," "described" his search, and "testified to the contents of the messages retrieved from the phone."); *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) ("The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, *see* Fed. R. Evid. 602, while opinion testimony can be presented by either a lay or expert

witness."); *United States v. Balouchzehi*, 2024 WL 4586526, at *2 (2d Cir. Oct. 28, 2024) (testimony did not require expert qualification where it was "not the product of specialized knowledge because it was based on the witness' personal participation in the investigation").

District courts in the Second Circuit routinely allow forensic cell phone examiners to testify as lay witnesses. *See United States v. Daskal*, 2023 WL 9424080, at *18 (E.D.N.Y. July 12, 2-23) (examiner's expected testimony on "forensic extractions performed on certain devices, the tools used," "the state of extracted files, and the storage of the Government's electronic exhibits does not require an expert certification" because it is "based on [examiner's] perception"); *see id.* (collecting cases in this Circuit which have found similarly); *United States v. Terry*, 2026 WL 3018244, at *3 (S.D.N.Y. Oct. 7, 2026) (permitting lay testimony on examiner's "practices used for extractions in this case and the contents of those extractions").

The Second Circuit's recent decision in *United States v. Buyer*, 2025 WL 855773 (2d Cir. Mar. 19, 2025) (summary order) does not compel a different result. (*See* Ortiz Mot. at 12-13 (arguing that the Court should not credit the cases cited by the Government which had allowed lay witnesses to introduce Cellebrite extractions because those cases predated *Buyer*)). In *Buyer*, an insider-trading case, the Second Circuit considered whether the

district court abused its discretion by admitting as lay witness testimony the (i) meaning of the presence of a website cookie on a co-conspirator's phone, and (ii) the fact that the phone had been restored after the co-conspirator's conversation with the defendant. *See id.* at *1, *4. Although the Second Circuit observed equivocally that "[s]ome of the testimony challenged by [the defendant] presents a close call, straddling -- or crossing -- the line between lay opinion and expert testimony," the Second Circuit ultimately held that, "even assuming that portions of the challenged testimony" were expert testimony, "any error in the district court's admission" of that testimony was harmless. *Id.* at *4. If anything, *Buyer* is consistent with this Court's conclusion that forensic examiners may provide lay testimony about their personal perception of the investigation.

Accordingly, Defendants' motion to exclude the testimony of the Government's forensic examiner witnesses is respectfully **DENIED.** The Court's ruling does not have any bearing on Defendants' ability to object at trial should the testimony cross into testimony requiring "scientific" and "technical" expertise pursuant to Federal Rule of Evidence 702.

## II. Motion to Compel Complete Expert Disclosures

### A. Expert Disclosures

Defendants also move to compel more complete expert disclosures for Special Agent Richard V.C. Busick and Professor

Daniel Taylor because, they argue, the Government's disclosures as to those two experts "do not comply with Fed. R. Crim. P. 16(a)(1)(G)(iii)." (Ortiz Mot. at 2.) The Government initially served and filed its expert disclosures on August 24, 2026. (*See* ECF Nos. 205-1 ("Busick Initial Disclosure"); 205-2 ("Taylor Initial Disclosure").) After Defendants moved in limine to compel more complete expert disclosures, the Government supplemented its disclosures on September 11, 2026. (*See* ECF Nos. 225-1 ("Busick Supp. Disclosure"); 225-2 ("Taylor Supp. Disclosure").)

The Government's initial and supplemental disclosures are summarized as follows. The Government's initial Busick disclosure described Special Agent Busick as "an expert in the analysis of location data, including historical cell site records and data session geolocation records." (Busick Initial Disclosure at 1.) The initial disclosure states that Special Agent Busick is "expected to testify regarding his analysis of historical cell site and location data for certain telephone numbers and gambling account data sessions from [Betting Platform-1] and [Betting Platform-2]," which is referred to as "Location Data." (*See id.* at 1.) The supplemental disclosure provided additional detail, and stated that Special Agent Busick would testify that "one or more of the Subject Individuals was:

(a) in the vicinity of Cleveland Guardians Major League Baseball Games between April 2023 and June 2025,

including around the times of the specific pitches described in the Superseding Indictment;

(b) in the vicinity of one or more of the other Subject Individuals and/or the defendants between April 2023 and June 2025;

(c) in the vicinity of the Ohio residence of defendant [Clase] between April 2023 and June 2025;

(d) in the vicinity of bank branches nearby Clase's Ohio residence on June 27, 2025, and June 28, 2025; and

(e) in the Eastern District of New York on June 15, 2025."

(Busick Supp. Disclosure at 1.)

The Government also provided an expert disclosure for Professor Daniel Taylor, a statistician and professor at the Wharton School at the University of Pennsylvania, who is "expected to testify" as to his opinion "that certain bets placed by the [Subject Individuals] on Clase and Ortiz pitches are outliers in several respects, including with respect to the size of the wagers, profitability and the outcome of the bets relative to their expected performance." (Taylor Initial Disclosure at 2.) The Government's disclosure explained Professor Taylor's methodology and disclosed that Professor Taylor may summarize voluminous betting data for the jury using simple statistics, charts, or demonstratives. (*Id.* at 3.) The Government's supplemental disclosure provided more granularity as to the methodology used by

Professor Taylor and the data supporting his opinion that the Subject Individuals' bets on Defendants' pitches were outliers. (*See* Taylor Supp. Disclosure at 1-4.)

**B. Discussion**

Federal Rule of Criminal Procedure 16(a)(1)(G)(iii) governs the sufficiency of the Government's expert disclosures. The Rule requires that the Government proffer a written summary of (1) "a complete statement of all opinions that [it] will elicit from the [expert] witness" as well as (2) "the bases and reasons for them" and (3) the witness's qualifications, including both the expert's prior publications within the last ten years and a list of any other cases in connection to which the witness has offered testimony in the last four years. Fed. R. Crim. P. 16(a)(1)(G)(iii). Defendants object that the expert disclosures do not provide a "complete statement of all opinions." Fed. R. Crim. P. 16(a)(1)(G)(iii); (*see* Ortiz Mot. at 15-20). The Court concludes that the expert disclosures, taking into account the Government's supplemental disclosures, comply with Federal Rule of Criminal Procedure 16(a)(1)(G)(iii).

**1. Special Agent Busick**

Although Defendants may wish for more detail with respect to Special Agent Busick's opinions, the Court cannot conclude that the expert disclosures do not encompass "all" opinions the Government expects to elicit from Special Agent Busick at trial.

*See United States v. Tuzman*, 2017 WL 6527261, at *10 (S.D.N.Y. Dec. 18, 2017) ("[W]hile 'the type of information that must be disclosed [in expert disclosures] is very clear, the *quantity* and *specificity* required of the disclosure is less so." (alterations adopted) (emphasis in original) (quoting *United States v. Mehta*, 236 F. Supp. 2d 150, 155 (D. Mass. 2002)). The Government's supplemental disclosure makes especially clear that Special Agent Busick will testify that "one or more of the Subject Individuals" and Defendants were at certain locations at certain times, including "in the vicinity of Cleveland Guardians Major League Baseball Games between April 2023 and June 2025, including around the times of the specific pitches described in the Superseding Indictment," and that the Subject Individuals and Defendants were in the vicinity of each other during the alleged conspiracy. (Busick Supp. Disclosure at 1.) The Government's supplemental disclosure for Special Agent Busick also contains the specific location data -- along with Bates stamps -- used by Special Agent Busick in forming his opinion, which adequately "facilitate[s] trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed." Fed. R. Crim. P. 16 Advisory Committee's Note to 2022 Amendment. So long as Special Agent Busick does not testify as to the location of undisclosed individuals at undisclosed locations and on undisclosed dates at

trial, the Busick disclosures comply with Rule 16. *See United States v. Ramos*, 2023 WL 9002868, at *5 (S.D.N.Y. Dec. 28, 2023) (Government's disclosure and supplemental disclosure as to expert cell site witness complied with Rule 16 where Government "produced a demonstrative exhibit with its expert disclosure that plots the general locations of the two cell phones" and "provided the defense with the information that [the expert] will testify that in a setting such as the Bronx, an urban cell site usually covers just a few city blocks"). Moreover, to facilitate Defendants' trial preparation, the Court has also ordered the Government to provide Defendants with all of the maps and other demonstratives illustrating the locations of individuals they expect to introduce during Agent Busick's testimony "[a]s soon as possible, but at least one week prior to the start of trial." (Oct. 14, 2026 Dkt. Order.)

In addition to seeking "complete" expert disclosures, Defendants seek preclusion of Special Agent Busick's testimony based on the Government's "discovery misconduct." (Clase Reply at 6; Ortiz Reply at 12-13.) Defendants base this argument on the fact that the Government's supplemental disclosures were made after the Court-ordered deadline and also that the Busick supplemental disclosure had stated that Special Agent Busick will analyze the location of the defendants in this case, whereas his initial disclosure only stated that he will analyze the location

of the fifteen Subject Individuals. (Ortiz Reply at 12-13.) The Government responds that Defendants never raised any deficiency before filing the instant motion to compel. (Gov. Opp. at 5.)[4]

Under Federal Rule of Criminal Procedure 16(d)(2), the Court has broad discretion to fashion a remedy for the Government's late service of supplemental expert disclosures. The Court concludes that no sanction is warranted. The supplemental disclosures were served on September 11, 2026, almost two months before trial, leaving Defendants ample time to prepare for the experts' testimony. *United States v. Kwok*, 2024 WL 1773143, at *3 (S.D.N.Y. Apr. 24, 2024) ("With more than three weeks until trial, the Court finds exclusion too harsh a remedy."); *United States v. Tuzman*, 2017 WL 6527261, at *11 (S.D.N.Y. Dec. 18, 2017) ("Trial courts in this circuit have concluded that preclusion is generally not appropriate" where "supplemental disclosures" permit the party to "prepare a meaningful cross examination.").

**2. Professor Daniel Taylor**

For similar reasons, the Court also finds that the Government's expert disclosures as to Professor Taylor are sufficient under Rule 16. Defendants argue that Professor Taylor's disclosures are insufficient because he cites "additional

[4] The Government's response ignores that it alone carries the obligation to provide complete disclosures before the Court-ordered deadline. Defendants, however, are not completely without fault, as Local Criminal Rule 16.1 requires them to have met and conferred with the Government in good faith to resolve discovery disagreements before motion practice.

analyses" he would present at trial "if asked," without presenting his conclusion. (Ortiz Reply at 14.) But Professor Taylor does offer his conclusion: that the bets placed by the Subject Individuals on certain Defendants' Pitches were outliers. Under Rule 16, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *United States v. Kwok*, 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024). The Government's supplemental expert disclosure for Professor Taylor goes well beyond providing "some" explanation supporting his expert opinions -- it provides comprehensive statistical analysis of the Subject Individuals' betting data. (*See, e.g.*, Taylor Supp. Disclosure at ¶ 12 ("Table 2 shows that the Subjects lose money on average in all categories, except for their Clase/Ortiz Pitch bets."); ¶ 13 (comparing distribution of wager profitability on Clase/Ortiz Pitches across all [Betting Platform-2] users and concluding that the "overwhelming majority of bets have profits between -$10 and $10 whereas the average profitability of the Subjects' bets is much larger, $363").) The fact that Professor Taylor conducted *additional* analyses using data from another betting platform supporting his opinion does not render his expert disclosure deficient. *See United States v. Ray*, 2022 WL 101911, at *6 (S.D.N.Y. Jan. 11, 2022) ("Rule 16(a)(1)(G) does not require a recitation of the chapter and verse of the expert's opinions, bases

and reasons." (quoting *United States v. Cerna*, 2010 WL 2347406, at *2 (N.D. Cal. June 8, 2010))).

Accordingly, Defendants' motion to compel more complete expert disclosures and for other sanctions relief is respectfully **DENIED.**

### III. Motion to Preclude the Government from Characterizing Mr. Ortiz as "In Debt"

Mr. Ortiz next moves to preclude the Government from characterizing Mr. Ortiz as being "in debt" pursuant to Federal Rule of Evidence 403. Rule 403 which allows the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." "Unfair prejudice" in this context means "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *United States v. Figueroa*, 618 F.2d 934, 943 n.4 (2d Cir. 1980) (quoting Fed. R. Evid. 403 Advisory Committee Note).

"[G]enerally speaking, any proof highly probative of guilt is prejudicial to the interests of [a] defendant." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (citation modified). But the specific prejudice that "Rule 403 is concerned with involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *Id.*

(quotations omitted). Further, it is "well within [a] court's discretion to draw the line to exclude testimony that . . . could well cause the jury to be influenced by sympathies having no bearing on the merits of the case." *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991). "[W]hen a court conducts a Rule 403 balancing, it must weigh '[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, . . . with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *United States v. Watts*, 934 F. Supp. 2d 451, 481 (E.D.N.Y. 2013) (quoting *Old Chief v. United States*, 519 U.S. 172, 182-83 (1997)).

Mr. Ortiz argues that the Government should be precluded from characterizing Mr. Ortiz as "in debt" because it has "minimal relevance" while being "substantially . . . prejudicial." (Ortiz Mot. at 21-22.) In Mr. Ortiz's view, characterizing Mr. Ortiz as "in debt" implies "financial desperation" that is "not supported by the agreement he actually signed." (*Id.* at 21) Rather, Mr. Ortiz argues that the "sophisticated, income-contingent financing" he received is "fundamentally a forward sale of a percentage of future, contingent baseball earnings, rather than an "ordinary personal debt obligation." (*Id.* at 7, 22.) The Government responds that, because Mr. Ortiz does owe a debt to the lending company, the Government should be able to use "plain English" to

describe his financial circumstances and Mr. Ortiz's arguments are better reserved for the jury. (Gov. Opp. at 7.)

Mr. Ortiz rightfully acknowledges that his financial circumstances around the time he allegedly participated in the pitch-rigging conspiracy are relevant to trial issues. (*See* Ortiz Mot. at 22 ("The [G]overnment remains free to argue whatever motive theory the actual, accurately described terms of the RockFence Agreement can fairly support.").) Thus, in assessing whether the characterization of Mr. Ortiz as "in debt" is unduly prejudicial within the meaning of Federal Rule of Evidence 403, the Court considers whether the characterization of "in debt" is an accurate description of Mr. Ortiz's financial circumstances.

When Mr. Ortiz was a minor league pitcher and "earning relatively little money," (*id.* at 6), Mr. Ortiz obtained a $1.7 million non-recourse loan from RockFence Capital Markets LLC, (*see* ECF No. 214-2 ("Loan Agreement") at §§ 2, 3.2). Under the terms of the agreement, Mr. Ortiz made or was scheduled to make monthly payments during the baseball season ranging from $25,000 to $180,000 (*Id.* § 1.2, Schedule 1.) Interest at 13% per annum (so long as Mr. Ortiz has a baseball contract) continues to accrue during the offseason, and a large portion of that interest rate accrual is added to the loan principal every April when baseball season starts again. (*Id.* § 4; *see id.* Schedule 1 (principal amount increased by about $100,000 in April 2025, consisting of

unpaid interest that accrued in the offseason). Although RockFence is ordinarily permitted under the Loan Agreement to seek recourse only as to Mr. Ortiz's baseball compensation, any "outstanding balance" of the loan becomes "immediately due and payable to [RockFence] on a fully recourse basis (that is, without limitation to [Mr. Ortiz's] [b]aseball [c]ompensation)" if certain trigger conditions -- described in the loan agreement as "Recourse Events" -- are met. (*Id.* §§ 3.2, 11, 12.) "Recourse Events" include if Mr. Ortiz (i) declares bankruptcy, (ii) violates or fails to fulfill the terms of his MLB contract, or (iii) is suspended from the MLB for more than one championship season. (*Id.* § 11(m), (n), (y)). Based on the language and characteristics of the financing agreement, the Court concludes that Mr. Ortiz's obligation to RockFence *is* a debt rather than merely a "forward sale of a percentage of future, contingent baseball earnings." (*See* Ortiz Mot. at 7.)

Given the probative value of Mr. Ortiz's financial circumstances at the time of the alleged pitch-rigging conspiracy in which he had purportedly received monetary kickbacks, as well as the accuracy of the term "debt" as a descriptor for Mr. Ortiz's financial arrangement with RockFence, the characterization of Mr. Ortiz as "in debt" cannot be said -- without more -- to be unduly prejudicial. However, the Court agrees with Mr. Ortiz that the Government should refrain from arguing that Mr. Ortiz was

financially desperate and that Mr. Ortiz's alleged participation in the pitch-rigging scheme was necessary to keep himself and his family afloat financially if such a conclusion would be based solely on the existence of the debt. To that end, though the Court respectfully **DENIES** Mr. Ortiz's motion to preclude the Government from characterizing Mr. Ortiz as "in debt," the Government is encouraged to use more neutral terms, such as describing Mr. Ortiz as "having an outstanding financial obligation," based on a loan which he agreed to pay pursuant to the terms of his RockFence agreement.

## Conclusion

For the foregoing reasons, Defendants' motions in limine are respectfully **DENIED**.

**So ordered.**

Dated: October 21, 2026
Brooklyn, New York

**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York